This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, the children's mother, appeals the decision of the Summit County Court of Common Pleas, Juvenile Division, which terminated both the children's father and appellant's parental rights regarding their son, Joseph, and their daughter, Selina, and granted the Summit County Children Services Board ("CSB") permanent custody of the children. This Court affirms.
 I.
On November 3, 1999, CSB received a referral stating that Joseph, age nine, and Selina, age six, were being sexually abused by their father. On November 12, 1999, CSB filed a motion for emergency temporary custody. The court granted the motion and CSB removed the children from appellant and the father's home and placed them in foster care. Joseph and Selina remained in temporary custody of CSB for over two consecutive years, throughout the duration of various court proceedings, including those involving criminal charges against both appellant and the father.
The father pled guilty to rape and gross sexual imposition of Sarah, appellant's eldest daughter and Joseph and Selina's half-sister, and child endangering of Joseph and Selina. On November 28, 2000, the father was convicted of the above crimes, declared a sexual predator, and sentenced to sixteen years in prison. On January 16, 2001, the juvenile court found Joseph and Selina to be abused, neglected, and dependent under R.C. 2151. Thereafter, appellant pled guilty to child endangering of Sarah, Joseph, and Selina. On May 15, 2001, appellant was convicted of the above crime, sentenced to three years of community control, and the court issued a no-contact order that prohibited appellant from any further visitation with Joseph and Selina.
CSB then filed a motion for permanent custody and a hearing was held on the matter on December 13, 2001. The trial court awarded permanent custody of Joseph and Selina to CSB, thereby terminating the parental rights of appellant and the father.
Appellant timely appealed and has set forth two assignments of error for review.
 II. FIRST ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY OF SELINA AND JOSEPH TO THE SUMMIT COUNTY CHILDREN SERVICES BOARD BECAUSE THE STATE FAILED TO MEET ITS BURDEN OF PROOF REQUIRING CLEAR AND CONVINCING EVIDENCE, PURSUANT TO R.C. 2151.414, THAT THIS WOULD SERVE THE CHILDREN'S BEST INTERESTS."
 SECOND ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED IN GRANTING CSB'S MOTION FOR PERMANENT CUSTODY AND THEREBY TERMINATING THE PARENTAL RIGHTS OF APPELLANT AS THE TRIAL COURT'S FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
The foregoing assignments of error will be discussed together as they raise similar issues. Appellant asserts that the trial court erred in granting permanent custody of Joseph and Selina to CSB. Appellant specifically argues that the trial court's findings were against the manifest weight of the evidence because the State failed to meet its burden of proof requiring clear and convincing evidence that granting CSB permanent custody of Joseph and Selina was in the children's best interests. This Court disagrees.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. In re Wise (1994),96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is neither abandoned nor orphaned, it must find clear and convincing evidence of both prongs of the statutory test:
 that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent or that the child has been in the temporary custody of the agency for more than twelve of the last twenty-two months and
 that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). R.C. 2151.414(B)(1).
Appellant challenges the trial court's conclusion on the best interest prong of the test, contending that it did not have before it clear and convincing evidence.
To satisfy the best interest prong of the permanent custody test, the trial court was required to find that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
 "[C]onsider all relevant factors, including, but not limited to, the following:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed * * * through the child's guardian ad litem[;]
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D).[1]
This Court will discuss the above factors in relation to the evidence presented within the record of the trial court proceeding.
 The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child.
On November 28, 2000, Joseph and Selina's father pled guilty to rape and gross sexual imposition of Joseph and Selina's older half sister, Sarah, and the father was declared a sexual predator. In addition, the father also pled guilty to child endangering of Joseph and Selina. The father was given a sixteen year sentence and is now in prison. He has no contact with Joseph and Selina.
On May 15, 2001, Joseph and Selina's mother, appellant, pled guilty to child endangering of Sarah, Joseph, and Selina. There has been a no contact order in place since March 2001, which forbids appellant to have contact with Joseph and Selina.
The testimony given by various witnesses during trial did not provide evidence that the father and appellant were caring, nurturing parents who protected their children. The father sexually abused Joseph and Selina, along with appellant's older daughter, Sarah, while appellant refused to acknowledge the abuse or take any action to protect her children from the father.
Several witnesses testified as to statements Joseph and Selina disclosed regarding their sexual abuse. Dr. Collin Myers, Joseph and Selina's counselor from February 2000 until March 2001, provided extensive testimony about the sexual abuse the children suffered at home. Dr. Myers testified that Joseph first talked about the abuse in March 2000. He testified that Joseph commented that his father sexually abused Selina and Joseph was angry because Selina told about the abuse and now they had to live with a new family.
Dr. Myers testified that when he first began asking Joseph if he wanted to talk about his parents, Joseph became sullen and answered, "Mom doesn't want me to talk." Dr. Myers testified that several months passed before Joseph stopped saying "I can't tell. I'm afraid." and opened up about his father. Joseph told Dr. Myers that he saw his dad touching Selina on her privates, "touching a bad place between her legs with his finger, the first finger. Her clothes were off. She was wearing panties around her legs."
Dr. Myers testified that he asked Joseph whether his father did anything to him and Joseph said "I think at the store, maybe the house. In the bathroom his pants were off. He made me suck on it. I was like, four or three. He made me touch his bottom with my hand." He further testified that Joseph then pointed to the penis and under the scrotum and on the butt of a drawing Dr. Myers provided during their appointment. Dr. Myers stated, "I asked how he felt. He felt sad, scared, mad at [his] dad. He burst into tears and said, `I'm sad.' He wouldn't talk anymore."
Dr. Myers testified that Joseph told him that his father forced Joseph to perform oral sex on him on numerous occasions. Dr. Myers further testified about a conversation he had with Joseph in one of their sessions, stating "Joe said, `Daddy made me drink beer. It doesn't taste good.' I said, `Is there something else?' `Yes. I don't want to tell.' He hung his head and cried. `Dad touched me on the penis with his finger and he put his penis in my mouth.' I asked how often. `Two or three or lots.' `How old were you?' `Three or four or five.' And then he started sobbing and wouldn't talk anymore."
Dr. Myers testified that a CSB worker on the case told him about Selina's abuse history before he met with Selina. He testified that "Selina reported that daddy licked her butt; licked her monkey, which is what she called her vagina; her belly button and chest, and she was naked and she was on top of him; and that her father put his peter, what she calls penis, on her monkey; and that he had her touch his peter. He told her to keep it a secret or she'd have to stand in the corner."
Dr. Myers testified that during Selina's counseling sessions with him, Selina usually relayed things that her father had done to her over time. He mentioned one particular session in March of 2001, where Selina came in to his office very agitated and upset. Dr. Myers testified that Selina had visited with her mom (this was their last meeting because a no-contact order was issued to appellant in regard to Joseph and Selina) and she told Dr. Myers, "I told my mom." Dr. Myers testified that he wrote down that Selina told her mom, "Why didn't you stop daddy from doing all that yucky stuff?" He stated, "and then I said to her, `what yucky stuff do you mean?' `You know, all the bad stuff he did to me I told you before.' And then she wouldn't repeat what the yucky stuff was."
Dr. Myers further testified to another session where Selina specifically told him how her father touched her private parts. He testified, "On May 4 she said she was at mommy's house on Sherman Street. When she was there daddy touched my bottom in front. That was in the bathtub. She kept telling him stop and he didn't. He touched me with his finger. She held up her right index finger. I asked her how she felt. She said she felt mad and sad. * * * When I asked where, she pointed to her vagina. I drew a stick figure and she pointed to the crotch area where I drew the X where her finger was sitting. I also asked at that time what the difference between truth and false was. She understood the word true." Dr. Myers testified that Selina also witnessed her father sexually abuse Joseph. Dr. Myers testified that Selina told him, "my daddy put my brother's mouth on his, daddy's big fat weiner."
Dr. Myers also testified that both Joseph and Selina had told him that their mother, appellant, knew about the sexual abuse. Both Joseph and Selina stated that their mother knew what was happening and she did not protect them. Dr. Myers testified that both Joseph and Selina would express to him that they were mad and sad and upset at their mom, appellant, for not helping them. Dr. Myers testified that during the year that he counseled Joseph and Selina, their independent statements and disclosures to him were always consistent to one another in terms of the sexual abuse they both suffered.
Wendy Hogan, Joseph's counselor after Dr. Myers, and Sue Wheeler, Selina's psychiatric social worker after Dr. Myers, both provided testimony during the trial that corroborated Dr. Myers' testimony. Ms. Hogan and Ms. Wheeler's testimony also corroborated Dr. Myers' testimony that appellant knew of her children's abuse and did nothing to help or protect Joseph and Selina from their father. Christina Miller, the CSB caseworker assigned to the children's case since November of 1999, testified that she had talked to appellant several times about whether she believed Joseph and Selina were abused. Ms. Miller testified that appellant "was pretty firm in denying that any of this happened and that Sarah lied about this and she said that the father had been tricked into the whole plea."
Appellant even denied her children's abuse on record before the trial court during the permanent custody hearing. The prosecutor asked appellant whether it was possible for the father to have contact with the children even though they were in day care. Appellant answered by stating, "Well, yes. He was their father. There was no abuse." After reviewing the record, particularly all the testimony taken during the trial, it is clear that Joseph and Selina did not have healthy, positive relationships that young children should have with their parents.
In contrast, the testimony provided regarding Joseph and Selina's foster parents was always positive. Various witnesses testified that both Joseph and Selina's learning and behavioral problems have improved since their placement with their foster family. Ms. Miller testified about her observation of Joseph and Selina with their foster mom and stated that the children were very excited to go back to their foster home. As far as their interrelation in the foster home, Ms Miller testified that Joseph and Selina "had spent about nine months with them prior and they were real excited about going back and real excited about having previous relationships with the other children in the home." Ms. Miller further testified that during her involvement in the case, no other relatives of appellant were ever suggested for the children's placement.
The testimony at trial consistently provided evidence that the children's placement with their foster family had had a positive impact on their health and happiness.
 The wishes of the child, as expressed * * * through the child's guardian ad litem.
It is very clear that Kimberly Nelson, the GAL assigned to this case, concluded from her investigation that it was in Joseph and Selina's best interests to award CSB permanent custody of the children and terminate appellant's parental rights. Ms. Nelson emphasized throughout the trial that appellant was aware of Joseph and Selina's sexual abuse and made no effort to protect her children from their father. Ms. Nelson pointed out that appellant's oldest daughter, Sarah, had a history of sexual abuse from the father's nephew before the father, and appellant failed to protect her as well.
Ms. Nelson stated that because appellant refuses to accept the fact that all three of her children have been sexually abused by the father, appellant is unable to protect Joseph and Selina from further abuse by anyone. In her closing argument to the trial court, Ms. Nelson argued that appellant "has a history of not protecting her children probably against many people. * * * These kids deserve to be protected and to be safe and the only way that we can ensure that is through permanent custody to CSB so that they'll be eligible for adoption."
 The custodial history of the child, including whether the child has been in the Temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
Joseph and Selina were taken into emergency temporary custody by CSB in November of 1999, and CSB maintained temporary custody of the children until this case went to trial in December of 2001. It is clear that Joseph and Selina were in CSB's temporary custody for over twenty-four consecutive months before the trial court granted CSB permanent custody of the children.
 The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
Joseph and Selina were in the temporary custody of CSB for over two years. Witness after witness testified that these children needed a permanent placement with their foster family so the children could begin to gain some normalcy and security in their lives, and gain validation of their sexual abuse so that they might begin the healing process. Dr. Myers testified that both children suffered from post traumatic stress disorder, and that Joseph also suffered from depression.
When asked his expert opinion about what effect having a parent disbelieve her children's disclosures of abuse would have on a child, Dr. Myers stated, "I've seen children then begin to withdraw from trust relationships because if their primary caregiver doesn't respond to them and protect them in a situation as traumatic as this they then don't believe anybody is going to protect them. Some children withdraw into themselves and become seriously depressed and non-functional. Other children become very angry in acting out." He further testified that he observed both of these symptoms in Joseph and Selina, but that after their visitation with appellant stopped, they became much calmer and the symptoms decreased in both children.
When Ms. Hogan testified as to what type of structure Joseph needed in order to continue to address his sexual abuse issues, she stated that he needed a stable home where his sexual abuse would not be denied and he would be helped in his healing process. Ms. Wheeler testified as to what type of structure Selina needed in order to continue to address her sexual abuse, explaining that she also "needs to be in a situation where she feels safe, where there is appropriate structure and caring, and where she is believed when she talks about what happened to her in the past, both sexually and physically, as well as the neglect." After careful review of the record, this Court finds that Joseph and Selina have not had this type of structure at any time with appellant, and they cannot obtain it without a grant of permanent custody to CSB.
After considering the above factors and carefully reviewing the entire record, this Court cannot find that the trial court erred in awarding CSB permanent custody of Joseph and Selina. The trial court's findings were not against the manifest weight of the evidence because the State met its burden of proof by presenting clear and convincing evidence that awarding CSB permanent custody of Joseph and Selina was in the children's best interests.
 III.
Accordingly, appellant's two assignments of error are overruled. The judgment of the trial court is affirmed.
BAIRD, P.J., WHITMORE, J. CONCUR.
[1] Subsection(5) of R.C. 2151.414(D) is inapplicable to the facts of this case.